IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| HSBC Finance Corporation as successor to Household International, Inc., | ) ) ) Civil Action No. 3:04-1200-CMC |
| Plaintiff, | ) ) |
| v. | ) ORDER GRANTING MOTION ) FOR SUMMARY JUDGMENT ) |
| decisioning.com, Inc., | ) ) |
| Defendant, | ) ) |
| v. | ) ) **)** |
| HSBC Card Services, Inc., a Delaware corporation, HSBC Retail Services, Inc., a Delaware corporation, HSBC Bank Nevada, N.A., a Nevada corporation, HSBC Bank USA, N.A., Delaware corporation, and HSBC Technology and Services (USA), Inc., a Delaware corporation, | ) ) ) ) ) ) ) ) ) |
| Third-Party Defendants | ) ) |

This matter is before the court on motion of Plaintiff HSBC Finance Corporation and Third-Party Defendants HSBC Card Services, Inc., HSBC Retail Services, Inc., HSBC Bank Nevada, N.A., HSBC Bank USA, N.A. and HSBC Technology and Services (USA), Inc. (collectively "HSBC") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, HSBC seeks a judgment of non-infringement of United States Patent Nos. 6,105,007 ("'007 Patent"), 5,904,811 ("'811 Patent"), and 5,870,721 ("'721 Patent"). For the reasons set forth below, the motion is granted in full.

**BACKGROUND**

This action is one of three related actions involving the '007 Patent. The two earlier filed actions were both brought by decisioning.com ("DCI") against entities it alleged had infringed the '007 Patent: *Decisioning.com, Inc. v. Federated Dept. Stores, Inc., et al*, Civil Action No. 3:03-cv-1924-CMC; and *Decisioning.com, Inc. v. Ameritrade Holding Corporation, Inc., et al*, Civil Action No. 3:03-cv-02837-CMC. By orders entered on March 28, 2007, the court granted summary judgment in favor of the originally named Defendants in those actions.[1]

The grant of summary judgment in *Federated* and *Ameritrade* rested, in large measure, on this court's construction of the term "remote interface" (and several variations of the term) in the '007 Patent. The court construed this term to require "dedicated" equipment which was defined to mean equipment owned or provided by the supplier of the financial service at issue and, consequently, to exclude consumer-owned personal computers. This construction resulted in full or partial summary judgment in both cases because some or all of the systems at issue were accessed through equipment that did not belong to the provider of the financial services at issue.

The same construction is central to HSBC's arguments in the present motion as to both the '007 and '811 Patents because the term "remote interface" appears in and received a common construction for both.[2] HSBC asserts and DCI does not contest that the services at issue in this action are all provided through consumer-owned personal computers.

---

[1] Claims against a recently added Defendant in *Ameritrade* were dismissed without prejudice to refiling in a separate action. Counterclaims seeking to invalidate the patents were dismissed without prejudice in both actions.

[2] A different construction was given to the term as used in the '721 Patent.

2

The other claim limitation at issue in this motion is the requirement that the system "issue proceeds for the loan as requested by the loan applicant in closed loop without further instruction." *See* '721 Patent Claim 1, 13 & 26; '811 Patent at 1, 8 (as amended in reexamination).

For present purposes, there are two critical distinctions between the three patents[3]: the first relating to the definition of "remote interface"; and the second relating to the scope of services or processes covered. As noted above, the '007 and '811 Patents share a common "remote interface" definition which excludes consumer-owned personal computers. Because of a difference in its specifications, the '721 Patent does not include the same limitation.

On the other hand, the '811 and '721 Patents are more similar to each other in the scope of services offered. This is because the '007 Patent covers processing relating to a broad range of "financial accounts," with the only limitation being that they must be "risk based." By contrast, the '811 and '721 Patents cover only the processing of "loans" which the court construed to exclude the issuance of credit cards. *See* Claim Construction Order (Dkt No. 82) at 6. The loan limitation is also reflected in the limitation for "issuance of proceeds . . . in closed loop" which was construed to require:

> Providing direct deposit by an electronic funds transfer to an account, or distributing a check or cash, automatically and without human assistance. Issuance of proceeds must be in "closed loop" which incorporates a requirement for "real time processing." Therefore, proceeds must be issued in a matter of minutes, but not necessarily before completion of the borrower's interaction with the remote interface.

Claim Construction Order at 5.

---

[3] Neither the '811 nor the '721 patent were at issue in *Federated* or *Ameritrade*. The three patents are, however, related as all three descend from a common grandparent, United States Patent Application No. 08/113,205, and, consequently, have numerous common terms and limitations.

3

**LEGAL STANDARDS**

**I.     Patent Infringement**

Infringement of a patent may be either literal or under the doctrine of equivalents. *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000). In either case, the proof of infringement must address each element of the claim(s) of the patent. *Id.* ("An accused product infringes if it embodies each claim element or its equivalent.").

**Literal Infringement.** To establish literal infringement, the patent holder must demonstrate that each of the elements or "limitations" of each claim of the patent at issue is present in the accused system. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). Moreover, the accused system must contain each limitation of the asserted claim exactly, without deviation. *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) ("Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement."). Therefore, "[i]f even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group*, 156 F.3d at 1211 (internal citations omitted). *See also Telemac Cellular Corp.*, 247 F.3d at 1330; *Litton Sys., Inc.*, 140 F.3d at 1454.

**Doctrine of Equivalents.** In the absence of literal infringement, a patent holder may also seek to establish infringement under the doctrine of equivalents. Under this doctrine, infringement may be found when: (1) every limitation of the asserted claim, or its equivalent, is found in the accused device, and (2) the equivalent limitation differs from what is literally claimed only insubstantially. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997) (holding, in addressing the function-way-result "triple identity" test, that "the particular linguistic

framework used is less important than whether the test is probative of the essential inquiry" of whether each element is insubstantially different). As noted in *Warner-Jenkinson*, "[a] focus on individual elements and a special vigilance *against allowing the concept of equivalence to eliminate completely any such elements* should reduce considerably the imprecision of whatever language is used." *Id.* (emphasis added).

The essential inquiry to be made in determining whether there is infringement under the doctrine of equivalents is, therefore, whether "the accused product or process contains elements identical or equivalent to *each claimed element* of the patented invention." *Id.* at 40 (emphasis added). As further stated in *Warner-Jenkinson:*

> [T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*Warner-Jenkinson*, 520 U.S. at 29.

Therefore, in accordance with the "all elements rule," there can be no infringement under the doctrine of equivalents if any one limitation of a claim or its equivalent is not present in the accused device or method. *See, e.g., Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001). Likewise, if a finding of infringement under the doctrine of equivalents "would entirely vitiate a particular claim element," the court must rule that there is no infringement under the doctrine of equivalents. *Bell Atl. Network Servs. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1279-1280 (Fed. Cir. 2001).

## II.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248. There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To defeat a motion for summary judgment, the non-moving party cannot continue to rely on unsubstantiated allegations but instead must present evidence sufficient for a reasonable jury to find in favor of that party, and it must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A court may grant summary judgment in a patent infringement case, as in any other case. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988). Summary judgment of non-infringement is properly granted "when no reasonable jury could find that every limitation recited in the properly construed claim [] is . . . found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

## DISCUSSION

**I.    REMOTE INTERFACE**

DCI does not challenge HSBC's assertion that none of HSBC's processes or systems literally infringe the '007 or '811 Patents with respect to the "Remote Interface" limitation. Instead, DCI asserts that there is at least a genuine issue of material fact whether the use of consumer-owned personal computers infringes this limitation under the Doctrine of Equivalents. This argument is rejected for the reasons set forth in the summary judgment orders entered in *Federated* and *Ameritrade*. *See Federated* Dkt No. 148; *Ameritrade* Dkt No. 152. The rationale set forth in those orders applies with equal force here.

6

## II. ISSUANCE OF PROCEEDS

**HSBC Opening Argument.** In its opening brief, HSBC argues that its systems do not "issue proceeds for any loan in closed loop without further instruction" because the only systems which offer loans, rather than credit cards, result only in pre-approval. More paperwork and human involvement are required before proceeds are issued for these loans. *See* Dkt No. 92-2 at 14-15 (citing Hayes Decl. at ¶ 10; Chase Decl. at ¶ 14).

As to credit cards, HSBC explains that DCI has identified only credit accounts (electronic credit "cards") offered through the "www.hpshopping.com" website as an infringing system. *See* Dkt No. 92-2 at 14. This website is owned by Hewlett Packard and allows customers either to purchase products using major credit cards or "an HP-branded credit card issued and managed by HSBC Finance Entities." *Id.* (citing Chase Decl. at ¶ 13). HSBC explains that the purchaser may apply and be approved for the HP-branded card while using the website. He or she may then use that card or any other card to make the purchase when checking out. *Id.*

HBSC argues that nothing in this transaction results in the "issuance of proceeds" to the consumer through the deposit of funds to the end-user's account. *Id.* "Moreover, . . . the value of the credit card transaction is not settled between HP and [HSBC] within a matter of minutes." *Id.* Rather, the value of the credit transaction is not transferred between companies until 24-72 hours after the customer [completes the] transaction." *Id.*

**DCI Opposition.** In response, DCI first distinguishes between two broad categories of HSBC system. The first, which DCI refers to as the "HSBC Accused Financial Account Systems," encompasses three categories of account: (1) HSBC issued major credit cards (MasterCard®); (2) third-party, store-branded credit cards; and (3) deposit accounts such as a checking or savings

account. Dkt No. 96 at 4. DCI then explains that a second broad category of accounts, which it refers to as the "HSBC Accused Loan Systems," encompasses "loans" obtained through a "merchant website similar to that described . . . for the HSBC Store-Branded (Third Party) Credit Cards . . . ." DCI asserts that "[a] loan can be offered, as opposed [to] a credit card, if the customer applies for financing after the customer selects goods or services to purchase, the amount is presented to the customer, and the customer proceeds to checkout . . . ." It is only this second broad category of account which is at issue as to the '721 and '811 Patents.

> DCI explains that the "Accused Loan Systems" can or do work as follows:
>
> The goods or services are first placed in the customer's shopping cart on the merchant's website. When the customer is ready to purchase the goods or services, the customer goes through a series of checkout web pages provided by the merchant. The exact amount due for the purchase of the goods or services is presented to the customer. When payment options are presented to the customer, the customer may be presented with a "financing option" from the merchant as an alternative to the customer paying for the goods or services via alternative means such as one of the customer's already established and owned credit cards. When the customer chooses to finance the purchase from the merchant, the customer becomes a loan applicant since the customer is applying to borrow a sum of money to pay for the goods or services. [Footnote providing example deleted.] The applicant is directed to an HSBC application for financing to pay for the goods or services. If the loan is approved, the customer's order and payment for the ordered goods or services is processed in real time.

Dkt No. 96 at 7-8.

The above explanation of how such an internet transaction "can" occur is stated in entirely hypothetical terms, with no citation to any evidence that transactions do, in fact, occur in this manner though HSBC's systems. The explanation is, however, followed by a description of the "Store e-financing" option which is available on the www.hpshopping.com website. *Id.* at 8-9. DCI describes this process as a "loan" application "because the customer is asking to borrow the money

8

required for payment." *Id.* DCI distinguishes a credit application because the latter would relate to a request to borrow money in the future. *Id.* In making this argument, DCI relies on pages from the HP Home Store website including the e-finance "Application Form." *See* DCI Ex. N (Dkt No. 96-4 at 28).

DCI argues that when a credit application is approved and a purchase made at the same time using that just-approved credit, it is at least the equivalent of a "loan" because "HSBC [becomes] responsible to pay the merchant for the goods. Payment is then made by HSBC to the merchant for the goods. The loan is completed – the customer will receive their goods in response to agreeing to pay back the money borrowed." *Id*. at 9. No information regarding the timing of HSBC's payment to the merchant is offered.

DCI also refers to a "Frequently Asked Questions" ("FAQ") section on the HP Home Store website which it suggests supports the view that the credit extension at issue is a "loan." DCI Exhibit O (Dkt No. 96-5). DCI cites, specifically, to steps explaining the e-financing process. These steps include the statements that the application is approved within thirty seconds and concludes by explaining that "Your order will be shipped to you – often on the same day – and your first payment won't be due for at least 25 days." *Id.*[4]

DCI also suggests that "HSBC *may have changed* . . . their website operations and processes over time to only allow customers to apply for a store-branded card. In this regard, the customer is forced to separately apply for a credit card first, . . . which would then fall under the '007 Patent." Dkt No. 96 at 10. DCI suggests that it would be necessary to take depositions to determine if such

---

[4] As explained under the "Court's Analysis" below, DCI fails to include a rather significant closing sentence which follows the list of steps. *See infra* at 12.

changes have occurred over the last six years. It cites to no evidence that changes have occurred and has, in any event, failed to seek discovery pursuant to the procedures allowed under the docket text order entered February 1, 2007. Dkt No. 94.

Based on the above discussion of how processing might proceed, DCI argues that there is a genuine issue of material fact whether what DCI describes as the "Accused Loan Systems" issue proceeds without further assurance. DCI suggests that HSBC incorrectly focuses on the customer as the person who must receive the proceeds, improperly disregarding transactions in which the equivalent of a "check" might be issued to a third party. It then argues that HSBC's obligation to pay the vendor for the product (which is to be shipped to the customer) is at least the equivalent of a check since a check represents a promise of future payment.

**HSBC Reply.** On Reply, HSBC asserts that DCI's argument must fail because it is entirely dependent on treating the transactions at issue as loans when the only evidence is that they are credit card applications. Dkt No. 98 at 9 (citing Chase Decl. ("the HSBC Finance Entities do not offer loans through any of the Web Sites. Rather, [they] only offer credit cards and credit card account numbers")). As HSBC correctly notes, DCI's arguments are, with minimal exception, made with "no citation, no expert, no report." Dkt No. 98 at 10 (also noting contradictions between DCI's argument and those exhibits which are cited).

In addition, HSBC notes that DCI has not challenged the assertion that the websites do not issue loan proceeds in "real time." DCI relies, instead, solely on the argument that the obligation arising between HSBC and the merchant is the equivalent of issuance of a check by HSBC to the merchant.

**Court's Analysis.** Before addressing what DCI does argue, the court must note what it does not. That is, DCI does not assert that any of the three categories of system which it describes as "HSBC Accused Financial Account Systems" constitute "loan" systems which might infringe either the '721 or '811 patents. Thus, DCI concedes that the following systems do not infringe either of these two patents: (1) HSBC issued major credit cards (MasterCard®); (2) third-party, store-branded credit cards; and (3) deposit accounts such as checking or savings accounts. Dkt No. 96 at 4.

DCI also fails to address HSBC's argument that the system HSBC concedes is a loan system does anything more than pre-approve loans. DCI, therefore, concedes that the system addressed in HSBC's opening brief does not infringe on either the '721 or '811 Patents.

This leaves DCI's arguments that the form of credit offered on the hpshopping.com website is properly treated as a "loan" rather than a "credit card" transaction and that the nature of the conclusion of the real-time transaction (creation of an obligation between HBSC and the merchant) is the equivalent of issuance of a check. Neither argument is well founded.

As to the first argument, the court notes that the e-financing Application Form is replete with references to a "credit card" and contains no references to a "loan." *See* DCI Ex. N. This begins with the depiction of a credit card in the upper left hand corner of the form. After entreating the customer, through a bold banner, to "Take advantage of no interest* or no payments* promotions with no money down, no application or annual fees[,]" the first line reads: "Apply to receive a *credit line* up to $5,000." *Id.* (emphasis added). Several lines later, the form refers to an added benefit of "exclusive discounts and promotions" available to "*cardholders*." *Id.* (emphasis added). In a box headed "Important Application Information," the applicant is forewarned: "Before applying for the *card* please note that . . . the following conditions may prevent your application from being

11

approved." *Id.* (emphasis added). Various other references on this three page form refer to the offer as being for a "credit card." There are no references to "loans."

The other pages cited by DCI, including the product selection and check-out/shopping cart pages (DCI Exs. L & M) include a notation defining what is meant by "e-financing." Both notations (marked by a "†") begin with the following comment: "On your HP Home & Home Office Store *credit card*, subject to credit approval." DCI Exs. L & M at " †" (emphasis added).

Similarly, the FAQ pages contain answers indicating that the nature of the arrangement is a credit line or card, not a "loan." The most direct is the following:

> **What is hpshopping e-finance?**
>
> HPshopping.com has partnered with Household Bank (SB) N.A., the leader in online financing, to bring you the hpshopping.com *card* – your key to instant online credit and secure account access. HPshopping e[-]finance is another name used for the hpshopping.com private label *credit card.*

*Id.* (emphasis added). Even the list of steps from the FAQ cited by DCI is followed by the statement: "Please note that hpshopping e[-]finance is *private label card* with a dedicated *line of credit* for purchasing items on the hpshopping.com Website and is valid only there." *Id.* at 7-8.

DCI's argument ignores the numerous references to credit cards cited above, and corresponding lack of reference to loans. To accept DCI's position would, in any case, erase the distinction which the court has drawn between loans (involving the issuance of "proceeds") and credit cards. *See* Claim Construction Order at 5-7 ("The term "loan" as used in the '721 and '811 patents does not include credit cards."). Thus, accepting DCI's position would negate or evade a claim limitation which defeats proof of either literal infringement or infringement under the doctrine of equivalents.

Even if the transactions or accounts formed through websites such as hpshopping.com could be deemed to be "loans," there is no evidence of any "issuance of proceeds" occurring in "real time." First, as to the "real time" component, what is established is no more than a *future* obligation of HSBC to pay the merchant for the *future* shipment of goods. The documentary evidence suggests that the goods may be shipped on the same day or at a later time. Payment to the merchant occurs within 24 to 72 hours of the completion of the online transaction. Chase Decl. ¶ 13. Thus, neither action occurs within "minutes" of the transaction. Thus, the "real time" component is not satisfied, even if the transfer of goods or transfer of funds could be deemed the "issuance of proceeds."

At most, what occurs in real time is the creation of an obligation on HSBC's part to pay money to the merchant at some point in the near future. DCI suggests that the creation of this obligation is the equivalent of "issuance of proceeds" because it is the equivalent of issuance of a check. The court disagrees.

DCI's argument ignores the clear distinction between the creation of an obligation and its satisfaction. What is created at the conclusion of a new-credit transaction on the HP Home Shopping website is an obligation for HBSC to transfer funds to the merchant. That transfer is completed in 24 to 72 hours. The creation of the obligation may be the equivalent of the sending of a bill. Only the transfer itself is the equivalent of paying that bill (or the sending of a check) because HBSC remains in control of the funds in the interim. By contrast, with the sending and receipt of a check, it is the recipient who has control over when the funds will be paid over.[5]

---

[5] The court recognizes that stop-payments may be placed on checks. This, however, requires affirmative action beyond the normal course. In the normal course, the recipient of the check has control over when to cash it.

The court, therefore, concludes as a matter of law that the creation of the obligation on HBSC's part to transfer funds to the website owner (HP in the hpshopping.com system) cannot be deemed "issuance of proceeds" either literally or under the doctrine of equivalents. The court further concludes that any issuance of proceeds which may follow (actual transfer of funds in 24 to 72 hours), even if automatic, is not completed in real time.

## CONCLUSION

For the reasons set forth above, the court concludes that HSBC is entitled to judgment as a matter of law that its systems do not infringe either the '007 or '811 patent due to a failure of proof as to the "remote interface" limitation. In addition, HSBC is entitled to judgment as a matter of law that its systems do not infringe either the '811 or '721 patents due to a failure of proof as to the "issue proceeds" elements. This disposes of all claims seeking a ruling of infringement or non-infringement. The remaining claims and third-party counterclaims are dismissed without prejudice.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 24, 2007